May it please the Court. My name is Hurley Mahan. I am the attorney for Appellant Rodney Gregory. Mr. Gregory applied for Social Security disability benefits. He had a hearing that we're complaining about the result from. That particularly, there are two particular points that I want to raise and they're raised in the brief. They were raised in the briefing to the U.S. District Court as well. The first is that it is the duty of the Social Security Administration under 20 CFR section 404.1520 and 416.920. It's the duty of the administrative law judge at the hearing and then subsequently the Social Security Administration to determine all of the impairments that the individual who is applying for disability has. Severe impairments and non-severe impairments because a combination of the non-severe impairments can also cumulatively affect the difficulties that an individual, the disabilities that an individual may have. There are several cases I cited under that. One of them Nicole versus Astru, 8th Circuit case 480F3 885 as well. And severe is particularly denoted as if it imposes significant restrictions upon an individual's ability to perform basic work activities. Now what's missing in this case from the decision by the administrative law judge, by the Social Security Administration and then ultimately by the U.S. District Court is that Mr. Gregory has a number of things. In finding number three by the administrative law judge at COPD, he has a status post-aortic mitral valve replacement. He had those actually replaced in 2001. He had them again replaced in 2012 when he was hospitalized for a month as he went through procedures and ended up when he came out of that with a pacemaker that had to be implanted. But that was redo procedures is what's noted in finding number three by the administrative law judge, history of arrhythmia and pacemaker placement. So that's the listing in that particular location. But nowhere is discussed the aneurysm. Where's the evidence in the record of the aneurysm's impact on workability? The impact of it. As opposed to the overall heart condition. That would make this a separate impairment that has to be independently identified and quantified insofar as it impacts work. One particular place is at 2627. That is a report July 31st of 15. Are you citing appendix? The administrative record. We have 2,500 pages of medical records. What does that say? This is from the cardiologist, his treating cardiologist that says Mr. Gregory should be four items, his prior sternotomies. He's had two of those rewired after you've had your ribs cracked open. His aortic and mitral valve replacements. The judge mentioned that particularly. Repair of his aortic aneurysm and repair of his aortic mitral continuity. So that the wall of the heart between two different sections of the heart, two different, the atrial and the ventricle on the left side was repaired as part of the procedure. And yet the administrative law judge missed that possibly because of the great number of records, but was also misled not intentionally. I'm not sure it was missed. I think that it's, you just said that it's in a listing of multiple facets of his heart condition, which caused the cardiologist in total to say his, his ability to lift is, is impaired. However, but what, where's the record that this is that this aneurysm that was discovered in the second replacement surgery is somehow an independent, severe impairment for social security purposes. I don't think that we'll find something that specifically says. I don't either. So I, it seems to me that's why this is, well, nitpicking is the word that comes to mind. The, the, the analysis of, of the, of the consulting physician who looked at the records and gave an old gate, I guess his name was Dr. Gator, who gave the overall testimony with respect to, to the capacity, functional capacity. But Dr. Gator didn't even know about the aneurysm or the mitral. How do you know that? Because I asked him that question and, and, and he said essentially what aneurysm. He only knew about, and he only testified to knowing about the procedures in the hospital that included the replacement of the valves, which is a relatively standard procedure. I'm going to say, however, there is, there's evidence that the aneurysm that was noted to even be a large aneurysm on in the operative report, which I'm not sure that, that either the doctor or the judge looked at, but that operative report is that the administrative record at eight 52 starts at that means it mentions that it's an operation of high complexity on page eight 54. There's a large aneurysm of the aorta mitral continuity. The procedures performed, including reconstruction of the aorta mitral continuity and anterior mitral leaflet. It was the two valves were replaced aortic and the mitral valves were replaced. There's excision of an aneurysm of the aorta mitral continuity. Was there any evidence in the record to indicate the aneurysm had an ongoing negative effect on his capacity to work? I believe that that's what Dr. Best report. And he's, he did several reports. I only mentioned one in there where he refers to those. Those are actually in, in, I think in, in the record would reflect those are the more severe impairments than the operative report. They had to remove part of the tissue between the two chambers of the heart and they had to sew it up. That creates a weakness. I don't think that. Well, I know, but I'm, if you can cite me to somewhere where the doctor based on the presence of the aneurysm limited his work capacity. I don't think that there's anything that identifies, identifies that separately from the listing of them. But when the, when Dr. Gata, who's the doctor that the administrative logic gave great credibility to doesn't know about the aneurysm, doesn't know that there's that surgery in the heart that is where there's a tissue that is weak and has to be fixed and it's sewn up that creates then if the doctor had known about it, I could have asked him questions about it, but he didn't know about it. This, the case that was the telephonic questioning was, I thought there was the surgery record sitting in front of the witness when he was being questioned. Pardon? No. So that he could look, I mean, did, did he, did he deny or did he admit not reading the entire surgical record? I don't think he was asked specifically about that. He said that he had reviewed the records of the case and it was now he's now he's asked about a specific, you know, yes, he had the record line and he says, I don't remember that or whatever. Right. As well as he didn't know about the pulmonary function study. Well, typical cross exam, you'd then get the record out and show it to him and say, all right, does this affect your opinion? But he's not present. He's by phone. I can't really ask. Yeah. Yeah. I can't really show it to him. That's a weakness with the telephone, but you could ask, you could ask the ALJ to, we need a better record on this. Well, at the time I just thought he, he doesn't know enough about this case to be able to give him an RFC. Oh, come on. I mean, if, if he says he read the whole, how it was a huge, it was described as a complex surgery. So presumably the record is complex and he does, he does, you know, he read, he reads the record and, and you don't have, you don't have a basis for saying he didn't, he didn't read the record. No, I don't have. And, and you didn't, and you didn't make a record for, he overlooked something that would affect his ultimate opinion. But when I asked him whether he knew about the, the, the aneurysm and he didn't know anything about it. But no, okay. Yeah. What, what, what was the date or the dates of the most recent heart procedures done? When were they, when were they done? What year? 2012, in June to July of 2012. Now he. Yet in November of 2014, he went out deer hunting and denied any fatigue, dizziness or chest pain. I must commend him on that. In terms of, well, anyway, maybe it has nothing to do with it. Okay. I have a red light. April 2, 2015 ultrasound showed normal. Well, anyway. Thank you. Thank you, Mr. Mayhem. Mr. Stewart. May it please the court. My name is Sean Stewart. I'm here on behalf of the social security administration. As a, as you discussed earlier, the, the record in this case is quite extensive, but I think if you go back, the arc of the medical story of this case is pretty clear. Back in 2001, the appellant had heart surgery, had a heart valve replacement, um, applied for disability was denied and then returned to work and worked until 2010. He stopped working in 2010, not for any heart related problems, but because his employer was going out of business. Once he left that job, he soon thereafter again applied for disability benefits. Then in June, 2012, there's no dispute between the parties. The, that he experienced a severe cardiac problem, specifically endocarditis, which in lay person's terms is when an infection travels to the interior of the heart. It damages the structures inside the heart, primarily the heart valves. Because of that infection and the damage that resulted, he had to undergo surgery. He did have to undergo two valve replacements. Shortly thereafter, while he was hospitalized, he did have to undergo also pacemaker implantation. He was discharged in July of 2012, had regular followups with his cardiologist. He was placed on a regimen of anticoagulation therapy due to the heart valve replacements over concerns about blood clots, which obviously would be a huge problem. So he was monitored for that. Now at step two, the ALJ clearly accounted for plaintiff's history of heart troubles and surgeries. He found that the endocarditis was a severe impairment, along with the valvular heart disease. Now our position is that encompasses all the damage that occurred inside the appellant's heart due to the endocarditis, including the aneurysm that appellant refers to and the aortic valve abscess. As was mentioned, that aneurysm was excised. It was removed, repaired. That was all done within the context of the heart surgery, including the valve replacement. What plaintiff is arguing for here today is a degree of specificity that just isn't required by agency regulations and isn't required by any case law. Appellant concedes that it can't really point to any evidence documenting additional limitations due to the aneurysm or the aortic valve abscess above and beyond the overall general surgery when he underwent the valve replacement. That evidence just isn't in there. The medical report he's citing from the cardiologist, the cardiologist just kind of listed all the problems that he had with his heart, and those were surgically repaired. And the ALJ noted he was status post-surgery. And the ALJ even referred specifically to the aneurysm in the decision when discussing the cardiac impairment. So did the cardiologist, was the cardiologist aware of the things that Mr. Gregory said he was not, or Mr. Mayon said he was not aware? The cardiologist or the medical expert who testified at the hearing? Dr. Gaeta was questioned by the appellant's representative at the hearing. And not surprisingly, this record is 2,000 pages. And most of the discussion of the aneurysm and the valve abscesses contained within the depths of surgical reports. Who was the cardiologist then? What was that doctor's name? It was Dr. Best, who was his treating cardiologist.  Okay, sure. It's right here in the brief. This was a Step 4 finding, wasn't it? It was a Step 4, and there was also an alternative. Out of any significance in your view to the appeal? Well, I think, for one, at Step 4, he retained the burden to prove he was disabled. I think also going back, he'd had the valve replacement surgery before, alleged disability, was denied, and went back to the job, the convenience clerk job. That's the same job the ALJ relied on at Step 4. So I think that is significant. So just to wrap that up, I think, and finally, these decisions, you have to consider the audience these decisions are written for. This is, first of all, the ALJ is a layperson, not a physician. Clinics love to point out when they think the ALJ is playing doctor, but these decisions are written for a layperson. They're written for the person who's claimed it, and they're written for a reviewing court. Was there a credibility finding against the claimant? There was also. The ALJ noted a number of credibility factors. There was evidence of deer hunting, as Judge Woolman pointed out. The fact is, treatment was pretty routine after his heart surgery. It was the normal pattern you would expect, where he was seeing his cardiologist less and less frequently. There was no evidence that he had a recurrence of severe heart problems, but frankly, the majority of his treatment was for the blood monitoring. For the anticoagulation. And also, the ALJ noted, as I referenced earlier, this was the same type of injury, the valve replacement, that he'd returned to work with before. In terms of his HIV, he was asymptomatic. He was in remission. And the fact that he'd stopped working for reasons that weren't related to his impairment. And it was also, there was evidence in the record that when he stopped working, he was acting as a caretaker for his father. So there was a lot of evidence relating to the consistency of his testimony of, on the one hand, that he's incapable of almost any activity, and on the other hand, there's a lot of evidence that conflicts with that. Turning specifically to Dr. Gaeta's opinion. As I said, the record in this case was 2,000 pages. A medical expert isn't called to one of these hearings to memorize the medical record. I mean, the record is there for all the parties to look at. What the medical expert is called to these hearings for is to review the evidence and then offer a medical opinion about whether that evidence shows evidence of a long-term functional impairment. That's really what the ALG is concerned about in making the step 4 finding. And admittedly, Dr. Gaeta could not memorize everything in a 2,000 page. But wouldn't it have been important, though, for him to note the aneurysm? No, because the aneurysm was an injury to the heart that was a result of the overall endocarditis, which the ALG found severe, and Dr. Gaeta talked about that. And more importantly, while Dr. Gaeta wasn't familiar in the heat of the moment with the aneurysm notation in the surgical report, he then went on and did precisely what his quotient was and said, well, if you look at his treatment with his cardiologist going forward, after surgery, there really wasn't any evidence of disabling functional limitations. The cardiovascular examinations were fairly normal and routine. On a few occasions, he had a mild heart murmur. On other occasions, not. Echocardiograms showed normal heart function. So based on that evidence, Dr. Gaeta properly, I think his opinions well supported that there wasn't evidence of disabling limitations, rather that he'd be limited to a range of light work. And that wasn't just Dr. Gaeta's opinion. There was also Dr. Morse, who was another physician who reviewed the records and also indicated that the appellant would be able to perform a range of light work. Just to close, to briefly address the last argument and appellant's brief in terms of the regular absences from the workplace, if you look at those records, they're almost all blood testing records. As I mentioned at the outset, the appellant was on anticoagulant therapy due to the risk of blood clots. And that requires frequent testing. Of course, you want to make sure that the person's blood can clot enough that they're not at risk of bleeding to death, but also that they don't run a risk of developing a blood clot. And if you look, the appellant did a wonderful job in his appendix of setting out all the treatment records. If you look through those, 2013, 2014, 2015, while he's characterizing it as indicating that the appellant would miss 30 to 40 days of work per year, if you look at those, they're almost all blood draws. And those could be accomplished going to a medical lab, having your blood drawn and leave. That could be easily accomplished by going before or after work or over lunch periods. There's no showing that those blood draws would result in the types of absences, the degree of absenteeism. Maybe you make that sound easier than it is in the real world. So I have no way of knowing. Well, that's true. How many employers put up with that? Were these the Coumadin checks, the INR? Yeah, the INR pro-time checks. I mean, if you look at the record, it was a blood draw, and then they'd send to the lab, and then his doctor would call to let him know to make slight changes in his medication, depending on what the test showed. And those were sometimes once a week. Then as time went on, they were mostly once a month, I believe. Just in conclusion, I think the ALJ's Step 2 finding was clearly consistent with the record. The ALJ doesn't have to go through and itemize every abnormal finding in a surgical report at Step 2. Based on the opinions of the two medical experts who reviewed the evidence, the ALJ properly determined that he could perform a limited range of light work. And I would respectfully ask that the court affirm the ALJ's decision and the district court's decision. Unless there are any questions. Thank you. All right. Thank you, counsel. Does the appellant have any time remaining? Counsel, did you have something absolutely we needed to hear from in response to the government? One thing, Your Honor. Volume 1 of the administrative record of Transcript 96 is the vocational expert's who talks about that you can only miss 24 to 36 times and still maintain employability. If you miss more than that, you're going to lose your ability to maintain employment. And the record shows that for medical treatment, there was 36 times after hospitalization in 2012, 30 days in 2013, 44 days in 2014. Thank you, counsel. The court thanks both of you for your presence and the argument you provided to the court this morning. The briefing you have submitted will take the case under advisement. Madam Clerk, does that conclude the docket for this morning?